UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GAYLON W. STAMPS, <br><br> Plaintiff, <br><br> -against- <br><br> ENDURANCE INTERNATIONAL GROUP HOLDINGS INC., JEFFREY H. FOX, JAMES C. NEARY, ANDREA J. AYERS, DALE L. CRANDALL, JOSEPH P. DISABATO, TOMAS GORNY, PETER J. PERRONE, CHANDLER J. REEDY, JUSTIN L. SADRIAN, and ALEXI A. WELLMAN, <br><br> Defendants. | Case No.: _____ <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, Gaylon W. Stamps ("Plaintiff"), by the undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Endurance International Group Holdings, Inc. ("Endurance" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Endurance, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger (the "Proposed Transaction") of Endurance and Clearlake Capital Group, L.P. ("Clearlake").

1

2.     On or about November 2, 2020, Endurance announced that it had entered into an agreement and plan of merger, pursuant to which Endurance would merge with and into Clearlake (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, Endurance's shareholders would be entitled to receive $9.50 per share in cash for each share of Endurance common stock they owned (the "Merger Consideration").

3.     On or about December 1, 2020, in order to convince Endurance's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.     In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Endurance's financial advisors, Centerview Partners LLC ("Centerview") and Goldman Sachs & Co. LLC ("Goldman Sachs" and together with Centerview, the "Financial Advisors") regarding the Proposed Transaction.

5.     The Proposed Transaction is expected to close in the first fiscal quarter of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is forthcoming.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

6.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Endurance's

public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Endurance's securities trade on the Nasdaq Global Select Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District appropriate.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## **PARTIES**

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Endurance common stock.

11.     Defendant Endurance is a Delaware corporation with its principal executive offices located at 10 Corporate Drive, Suite 300, Burlington, Massachusetts.  The Company's common stock trades on the Nasdaq under the ticker symbol "EIGI."

12.     Defendant Jeffrey H. Fox ("Fox") is, and has been at all relevant times, the Company's Chief Executive Officer and a director of the Company.

13.     Defendant James C. Neary ("Neary") is, and has been at all relevant times, the Chairman of the Board of Directors of the Company.

14.     Defendant Andrea J. Ayers ("Ayers") is, and has been at all relevant times, a director of the Company.

15.     Defendant Dale L. Crandall ("Crandall") is, and has been at all relevant times, a director of the Company.

16.     Defendant Joseph P. DiSabato ("DiSabato") is, and has been at all relevant times, a director of the Company.

17.     Defendant Tomas Gorny ("Gorny") is, and has been at all relevant times, a director of the Company.

18.     Defendant Peter J. Perrone ("Perrone") is, and has been at all relevant times, a director of the Company.

19.     Defendant Chandler J. Reedy ("Reedy") is, and has been at all relevant times, a director of the Company.

20.     Defendant Justin L. Sadrian ("Sadrian") is, and has been at all relevant times, a

director of the Company.

21.     Defendant Alexi A. Wellman ("Wellman") is, and has been at all relevant times, a director of the Company.

22.     The Defendants identified in paragraphs 12 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

23.     Endurance is a publicly traded Delaware corporation and leading provider of cloud-based platform solutions that helps millions of small businesses worldwide with products and technology to enhance their online web presence, email marketing, business solutions and more, operating a family of brands including: Constant Contact, Bluehost, HostGator, and Domain.com, among others.  Headquartered in Burlington Massachusetts, Endurance employs over 3,800 people across the United States, Brazil, India, and the Netherlands.  Endurance's common stock trades on the Nasdaq under the ticker symbol "EIGI."

24.     Prior to the announcement of the Proposed Transaction, Endurance had excellent growth prospects.

25.     For example, on July 30, 2020, just a few months before the Proposed Transaction was announced, Endurance issued a press release entitled *Endurance International Group Reports 2020 Second Quarter Results and Announces the Acquisition of Retention Science* that announced that the Company was poised for continued and sustained growth even in the face of the "backdrop of significant macro-economic disruption due to the COVID-19 pandemic," stating in part:

"Against a backdrop of significant macro-economic disruption due to the COVID-19 pandemic, we are encouraged by the resilience of small businesses and their drive to adapt. As we noted in our preliminary update two weeks ago, we see secular demand for our products and services and are pleased with our subscriber additions and revenue growth," commented Jeffrey H. Fox, president and chief executive officer of Endurance International Group.

"As we execute the second half of 2020, we remain focused on investments that we believe will increase the value we deliver to our customers, including an expanded solution set. As such, we are pleased to announce that we signed an agreement to acquire Retention Science, an AI-driven provider of e-commerce email marketing services."

**Retention Science Acquisition**

Retention Science is located in Santa Monica, California. Under the terms of the definitive merger agreement, Endurance will acquire Retention Science for approximately $35.0 million, consisting of $17.5 million to be paid in cash upon close and the remaining $17.5 million to be paid in a combination of deferred consideration and earnouts over the next three years. The closing of the transaction is subject to customary closing conditions and is expected to close on or before August 15, 2020.

"We are excited to add the Retention Science team to Endurance and to our digital marketing business. The Retention Science platform allows us to complement our e-commerce capabilities following the acquisition of Ecomdash last year, and supports our strategic focus on investing to expand our total addressable market," continued Mr. Fox.

26.    Thus, the Proposed Transaction comes at a time when Endurance's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" the Company's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

27.    Despite Endurance's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in the Company's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for

the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

28.     On November 2, 2020, Endurance issued a press release announcing the merger agreement:

### Endurance International Group Announces Agreement to be Acquired by Clearlake Capital Group L.P. for $9.50 per Share

November 2, 2020 07:30 ET

BURLINGTON, Mass., Nov. 02, 2020 (GLOBE NEWSWIRE) – Endurance International Group Holdings, Inc. ("Endurance" or the "Company") (Nasdaq: EIGI), a leading provider of cloud-based platform solutions designed to help small and medium-sized businesses succeed online, announced today that it has entered into a definitive merger agreement to be acquired by affiliates of Clearlake Capital Group L.P. ("Clearlake") in an all cash transaction valued at approximately $3.0 billion including outstanding indebtedness.

Under the terms of the definitive agreement, which has been unanimously approved by the members of the Endurance Board of Directors, affiliates of Clearlake will acquire all of the outstanding common shares of Endurance for $9.50 per share in cash. The purchase price represents a 79% premium over Endurance's unaffected share price of $5.30 as of September 25, 2020, the last trading day prior to media speculation about a potential transaction, and a 64% premium to its closing share price on October 30, 2020 of $5.81.

A special meeting of Endurance shareholders will be held promptly following the filing of a definitive proxy statement with the U.S. Securities and Exchange Commission (the "SEC"). Certain affiliates of Warburg Pincus and Goldman Sachs Private Equity Partners have entered into a voting agreement committing them to, among other things, vote approximately 36% of the outstanding shares of Endurance common stock in favor of adopting the acquisition agreement.

"We are pleased with this agreement which recognizes the value of our multi-brand scale platform. We are proud to serve approximately 5 million customers worldwide as a provider of solutions that help small and medium

businesses succeed online and enhance the value of their customer relationships," said Jeff Fox, President and Chief Executive Officer of Endurance.

"The Endurance family of brands has built a leading position in the large and growing cloud hosting, domain, and digital marketing software space. We look forward to partnering with this talented team and supporting its long-term strategic plan to drive growth through its focus on customer value. We are excited to leverage Clearlake's *O.P.S.*® framework to help the Company fuel growth both organically and through acquisitions," said Behdad Eghbali, Co-Founder and Managing Partner, and James Pade, Partner at Clearlake.

The proposed transaction is expected to close in the first quarter of 2021 and is subject to approval by Endurance shareholders, along with the satisfaction of customary closing conditions (including antitrust regulatory clearance). Clearlake will finance the transaction with a combination of committed equity financing from the Clearlake funds and has secured committed debt financing for the proposed transaction, which is not subject to any financing condition. Upon completion of the acquisition, Endurance will become a wholly owned affiliate of Clearlake.

For further information regarding the terms and conditions contained in the definitive merger agreement, please see Endurance's Current Report on Form 8-K, which will be filed in connection with this transaction.

Given today's announcement, Endurance is releasing its third quarter 2020 financial results concurrent with this announcement. The Company does not intend to hold a conference call on Thursday, November 5, 2020 to discuss earnings as previously announced.

Centerview Partners and Goldman Sachs are acting as co-financial advisors and WilmerHale as corporate counsel to Endurance.

J.P. Morgan, BofA Securities, Deutsche Bank Securities, and UBS Investment Bank provided committed debt financing, and alongside Rothschild & Co and Lazard acted as financial advisors to Clearlake. Sidley Austin LLP is serving as corporate/M&A counsel and Kirkland & Ellis LLP as financing counsel to Clearlake.

**The Preclusive Deal Protection Devices**

29.    To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate

conjunctively to make the Proposed Transaction a *fait accompli* and all but ensures that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

30.     The Merger Agreement is protected by "no-shop" provisions that prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

31.     These no-shop provisions also require the Board to provide Clearlake written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Clearlake following receipt of the notice, so that Clearlake has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

32.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $37,393,000.00 with respect to any termination under the no-shop provision.

33.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

34.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial

intervention.

**The Proxy Omits Material Information**

35.     On or about December 1, 2020, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

36.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A.     The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

37.     The Proxy fails to provide material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility that the Merger Consideration is inadequate.

38.     The Proxy fails to disclose: (i) when the Financial Forecasts through fiscal 2023 were prepared, and (ii) when the fiscal 2024 and 2025 extrapolations were "subsequently prepared." Given that the "subsequently prepared" extrapolations suggest tepid growth in fiscal 2024 and 2025 relative to the strong growth projected through fiscal 2023 and were not provided to prospective bidders, it appears that these extrapolations were prepared as a last-minute measure to help justify the Merger Consideration and do not fairly value the Company. *See, e.g., Azar v. Blount Int'l., Inc.*, No. 16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493, at *20-25 (D. Or. Mar. 20, 2017).

39.     The Proxy fails to disclose whether Party A specified the "nominal amount" by which it may be been able to increase its proposed purchase price on October 30, 2020 and, if not,

why the Board determined that Party A should not be informed that Endurance would be willing to grant a short period of exclusivity to a counterparty that would increase its price to $9.50 per share.  Indeed, at the time, Party A's proposed price ($9.16 per share) was greater than Clearlake's ($8.90 per share) and Party C's ($8.75 per share) and an increase to $9.50 per share would be an increase of approximately 3.7%, just the sort of "nominal amount" that may have been contemplated by Party A.

### B.     The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading

40.     The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

41.     The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

42.     With respect to the *Financial Forecasts* on Page 66, the Proxy fails to disclose the following line items used to derive the Adjusted EBITDA, Unlevered Free Cash Flow (Cash EBITDA—CapEx), and Unlevered Free Cash Flow projections used by the Financial Advisors in the Discounted Cash Flow analyses: (i) Operating expenses, (ii) General and administrative

11

expenses, (iii) Stock-based compensation expenses, (iv) Change in net working capital, (v) Depreciation, (vi) Capital expenditures, (vii) Changes in deferred revenue, (viii) Changes in costs of goods sold for domain registration fees, (ix) ASC 606 adjustments to sales and marketing expenses, and (x) any other items used to derive these projections. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

43.     With respect to Centerview's *Selected Public Company Analysis* beginning on Page 53, the Proxy fails to disclose (i) the objective criteria that Centerview relied upon in deeming the selected companies "similar" to the Company, (ii) the individual multiples for each of the selected companies, and (iii) Centerview's full rationale and basis for selecting a 2021E Adjusted EBITDA multiple range of 7.0x to 8.5x.

44.     With respect to Centerview's *Selected Precedent Transactions Analysis* beginning on Page 53, the Proxy fails to disclose: (i) the objective criteria that Centerview relied upon in deeming the selected transactions "relevant," (ii) the individual multiples for each of the selected transactions, (iii) Centerview's full rationale and basis for selecting a range of 8.0x to 11.0x Last Twelve Months Adjusted EBITDA to value the Company, and (iv) whether the stated "TEV / NTM Adjusted EBITDA Multiples" implied by the precedent transactions were actually based on the target companies' Last Twelve Months Adjusted EBITDA or based on the target companies' Next Twelve Months' ("NTM") Adjusted EBITDA and, if actually based on NTM multiples, Centerview's rationale and basis for evaluating precedent transactions based on the target company's Next Twelve Months Adjusted EBITDA multiples but valuing Endurance based on the

Company's Last Twelve Months Adjusted EBITDA multiple.

45.     With respect to Centerview's *Discounted Cash Flow Analysis* ("DCF") beginning on Page 55, the Proxy fails to: (i) fully disclose Centerview's rationale and basis for selecting discount rate ranges of 9.0% to 10.0%, (ii) fully disclose Centerview's rationale and basis for applying a range of Adjusted EBITDA terminal multiples of 7.0x to 8.5x and Adjusted EBITDA growth rates of 3% and assuming an Adjusted EBITDA margin of 29.3%, and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples.

46.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**.  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's

shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

47.     With respect to Centerview's *Premia Paid Analysis* beginning on Page 56, the Proxy fails to disclose: (i) the individual transactions that were analyzed, (ii) the individual premium in each transaction, and (iii) Centerview's full rationale and basis for selecting a reference range of approximately 20% to 50% of the Company's closing stock price on September 25, 2020.

48.     With respect to Centreview's *Analyst Price Target Analysis* beginning on Page 56, the Proxy fails to disclose (i) the source, dates, and amounts of the individual price targets, or at least (ii) provide a measure of central tendency that fairly summarizes the results of the analysis.

49.     With respect to Goldman Sachs' *Selected Companies Analysis* beginning on Page 59, the Proxy fails to disclose (i) the objective criteria that Goldman Sachs relied upon in deeming the selected companies "similar" to the Company, (ii) the individual multiples for each of the selected companies, and (iii) Goldman Sachs' full rationale and basis for selecting a 2021E Adjusted EBITDA multiple range of 7.0x to 8.5x.

50.     With respect to Goldman Sachs' *Selected Transactions Analysis* beginning on Page 61, the Proxy fails to disclose: (i) the objective criteria that Goldman Sachs relied upon in deeming the acquired companies "similar to certain operations of the Company," (ii) the individual multiples for each of the selected transactions, and (iii) Goldman Sachs' full rationale and basis for selecting a range of 8.0x to 11.0x Last Twelve Months Adjusted EBITDA to value the Company.

51.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* beginning on Page 61, the Proxy fails to disclose: (i) Goldman Sachs' full rationale and basis for calculating the implied enterprise value as of the end of each fiscal year based on a one-year forward Adjusted EBITDA multiple range of 7.0x to 8.5x, and (ii) Goldman Sachs' full rationale and basis for applying a discount rate of 14%.

52.     With respect to the *Illustrative Discounted Cash Flow Analysis by Goldman Sachs* beginning on Page 62, the Proxy fails to: (i) fully disclose Centerview's rationale and basis for selecting discount rate ranges of 9.50% to 10.50%, (ii) fully disclose Centerview's rationale and basis for applying a range of Adjusted EBITDA terminal multiples of 7.0x to 8.5x and implied perpetuity growth rates ranging from 1.1% to 3.4%, and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples.

53.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest. The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.

Thus, Defendants' omission renders the projections and summaries disclosed in the Proxy misleadingly incomplete.

54.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

57.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9.

58.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

59.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

60.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

61.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the

Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.   The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.   Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

62.   The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.   The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.   Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

63.   The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

64.   The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.   Plaintiff has no adequate remedy at law.   Only through

the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They

were thus directly involved in preparing this document.

69.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

70.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

72.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 8, 2020                              **MONTEVERDE & ASSOCIATES PC**

By:                                                  */s/ Juan E. Monteverde*
                                                     Juan E. Monteverde (JM-8169)
                                                     The Empire State Building
                                                     350 Fifth Avenue, Suite 4405
                                                     New York, NY 10118
                                                     Tel: (212) 971-1341
                                                     Fax: (212) 202-7880
                                                     Email: jmonteverde@monteverdelaw.com

                                                     *Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
        jfruchter@ademilaw.com

*Attorneys for Plaintiff*